The next case is Agility Public Warehousing Company v. Department of Defense, 2016-12-65, Mr. Elwood. Thank you, Your Honor. May it please the Court. The military's use of Agility's capacity to perform the delivery contract at issue in this case. It required Agility to procure literally hundreds of additional trucks in order to carry out required deliveries. The Armed Services Board of Contract Appeals made three errors when it concluded that Agility wasn't entitled to any additional compensation for the work that it did in Iraq. The first is that the Board explicitly said it need not decide, and was not deciding, the issue of the implied duties. Can I rewind you for a second and just focus on this, and I'm not sure what to make of it. The Board described your claim as simply and purely for the transportation rate times the number of days. Simply that. Your three counts of your complaint do the And I wonder, I guess, whether you have, in this case, a claim that says they breached a variety of agreements. Our damages may or may not be related to the transportation rate times the number of days, which it's very easy to see how maybe it's not in fact related. Maybe you had excess capacity, but damages might be how many other trucks you had to all of that. But I wonder, are you limited to essentially your claim to the transportation contract rate times the number of days? I think, well, to begin with, this was a bifurcated proceeding. We never got to damages. And I think that contract rate times the number of days is the outer limit of what we'd be entitled to under each of the different theories. But again, because we never got to the damages phase, this is just subtle liability, we didn't have to really drill down on exactly what the measure was in each instance. But it was along the lines of like any civil complaint, where you state the maximum amount that you might be entitled to. Well, but I think the problem here is that putting aside whether you got to damages, we need to understand your legal theory as to implied duty. Is your theory that the government did certain things which caused you to incur costs that were unrelated to the 29-day cap? Or is your theory that even though everybody understood there was a 29-day cap, there was bad faith activity by the government that made it impossible for anyone to ever work within that cap? Our theory was that this was a delivery contract. And in order to be able to make additional deliveries, we needed the trucks back. And the government had a duty to try to return those trucks. And it violated that by over-ordering food, by not facilitating the return of the trucks by using them for storage. And I think that that is entirely consistent. Even if you conclude that the board got it right, that the contract here overrode the storage prohibition and capped fees after 29 days, that is precisely when you would want people to have a duty to try to procure additional storage. And I think that's consistent. If you look at the actual evidence, it's consistent with the idea that they understood even after Mod 27, the government understood it had a duty to try to do more. If you look at page 3914, Gary Shifton said that Agility, Gary Shifton is contracting officer for his boss, said that Agility had a case for additional compensation. Because here it is almost a year after we knew we didn't have enough storage. And we're just now getting around to getting enough storage. Which is a sign that they didn't do what they could to facilitate the return of the trucks to reduce the amount of trucks used for storage. And similarly, that they... Are you saying that there was a quid pro quo for the cap? Well, I think that that is also true. But I think that independent of the 29 day cap, I think that it's true that they made, they sort of undertook to try to keep below the 29 day cap. But independent of that, they had an obligation to try to do enough to reduce the need for storage, to tell the troops in the field to stop ordering so much food. So that there wouldn't be this problem with storing food on trucks and with the inability to return trucks. So what's wrong with the following way of looking at this? Mod 27 was agreed to because of the contracting officer's concern about certain tail events of extremely long holding on to trucks. The agreement was you're going to get 29 days to the extent it's the government's fault. It used to be you didn't even have to establish that. And that, by fair implication, was an elimination of the storage prohibition of Mod 1. And that takes care of essentially your first three claims. The express breach and the implied duties because there no longer was a duty attachable to the written contract about storage. But part of the quid pro quo was you had this side deal. And let's assume you really do have a side deal. The problem is that was not written down. And so the content had to be proven at trial. And she showed up and your guy didn't. So why couldn't the board find what the content of the side deal was? Well, I think there's an awful lot there. I think the first thing is with respect to whether or not they overrode the cap on transportation fees, which is for customer cause events, which they specifically linked to capability to unload and return trucks, whether that is overriding the storage prohibition. And I think to begin with, it doesn't address storage. It doesn't speak in terms of it. And it's part of an agreement, Mod 27 included specific language that said that except as provided herein, I'm trying to find the language here, except as provided herein, all of the other remaining, all of the remaining provisions remain in full force and effect, which I think at a minimum has to kind of toggle on an idea of kind of clear statement. If you're going to absolve yourself of liability, you have to speak clearly. And that's a basic principle of contract interpretation when you're dealing with the government. And, you know, none of that I think was present here. And then in addition to that, you have the extraneous evidence or the outside evidence. You have at page 3969, you have agility telling Contracting Officer Ford in March of 2005, six months after Mod 27 was in place, you're violating the storage prohibition here. You're using our trucks for storage in violation of Mod 1 paragraph 4, referring to the very provision that is the storage provision. Her response to that wasn't to say, what are you high as a kite? That was abrogated by Mod 27. She didn't say anything of the sort. And you also have at page 3914 of the appendix, where again Shifton says, you know, we better track down what's all going on at these various sites and have some justification for why we're holding on to these trucks. But what's your response to the fact that, as the government points out, that the average time did actually go down after the 29-day cap was in place in the expanded TLO program? I mean, doesn't that indicate that the government was really trying to do its part? I don't. Well, to begin with, our understanding is that it actually increased for a while after Mod 27 before it went down. But in any event, I think that even what you have to look at is more of the input rather than what came out of it. And the board just simply didn't look at that. You have to look and see whether they actually did things to decrease the rate of over 29-day trips and see what did they actually do to try to provide for adequate storage. What did they do to try to cut down on overordering? And again, as I said, if you look at page 3914 of the joint appendix, it looks very much like inside the government, when they were in the privacy of their own offices, they said, we didn't do enough. You know, here it is. We've known for a year that there is no need to do it now. That is, I think, not a sign that they were doing what they could to reduce the incidence of storage. Well, they did order the extra storage, right? Well, according to that email by Chifton, who was, again, a contracting officer for its supervisor, they were just getting around to doing that now, that they could have done more earlier. And furthermore, contracting officers representative Burkett said, you know, the Army tries to fix its mistakes by essentially re-delivering the goods on Agility's trucks. And you know, you can look through the whole record, and you can try to find instances where they're telling the people who are engaging in overordering, you know, cut it out, guys. You have enough. And I just simply haven't found it yet. And I think that that's the things, when you're looking at it, is what are they doing to try to make sure that there is actual permanent storage, or are they doing enough there? And are they doing enough to eliminate this kind of overordering that was resulting in rampant? How much proof would you have to have in order to establish this kind of implied duty claim? Because the reality is that the 29-day cap did shift certain risks away from the government to your client, did it not? I think it did, but I don't, when you look at it, what it shifted to it is the risk of, you know, capability to unload the truck. That's explicitly, the government or the people who wrote the contract here, they could have made it however broad or specific as they wanted, and all they specifically covered was capability to unload the truck. And the difference between that and paragraph 6 of Mod 1 is striking, because in paragraph 6 of Mod 1, the government absolved itself of any liability from loss if the trucks are destroyed, and they couldn't have used more clear language than they did there. But the government has had some pretty striking numbers in their brief about the small percentage of instances that really went beyond 29 days. I know you say that it represents a lot of money, but basically there was a lot of money that also was made, a lot more that was made, and everything came in under the 29-day cap. Well I think that the way to make it sound small, as they say, was like 4% of the overall cost of the contract. But, you know, it's 1,750 days over 29 days. It's, you know, four years essentially of truck trip days above the 29-day cap. There were literally scores of trucks that were out there for more than 50 days. So they may say it's a small amount, but if it's such a small amount, pay it. It's, you know, $12 million of truck use, and as we said, and they really haven't disputed this, is it essentially required us to buy almost as many, or procure almost as many, twice as many trucks as we thought we would need. And at that point I'd like to reserve my remaining time for rebuttal. We will do that, Mr. Ellwood. Mr. Gwynne. Your Honor, may it please the Court. As counsel talked about, and as the Court asked questions regarding, I think it's important to note here something that we talk about in the footnotes a lot. The parties' agreement, the bargain that they struck through the entire contract. I'm sorry, you're starting with an argument that you made in footnotes in your brief? I'm not, Your Honor. I'm talking about the entire deal, but we talk about these claims in certain footnotes. But the deal as a whole was for round trips through the entire time of the contract from mod to on. And notably, Agility makes no claim, if there's this independent cause for a breach of the storage provision, Your Honor, Agility makes no claim for any trip under 29 days throughout the course of the contract. And they make no claim. But so what? I mean, they say they thought that maybe they had a claim, but they got paid, so why fuss about it? They probably didn't, sort of, no harm. I'm not sure what you think the fair implication about the claims that they brought is. Well, I think it reflects not only counsel's arguments, but I think it reflects the way payment was going to be made was per round trip. That happens in mod 2, and then it's continued in mod 27. And what mod 27 really does is modify mod 2's change, which was to change from a contract. The contract for other places, like Oman or Qatar, which is the original contract before Iraq comes in, was for one way. It was from the warehouse to the delivery point, and then there was a provision that talked about demerge fees. That demerge fee provision uses the same language, as we point out in our brief. It talks about delays as a result of offloading the trucks. That changes in mod 2. Mod 1 talks about Iraq, and it expands the program into Iraq. Mod 2 sets up the payment structure, the general structure that the parties were going to use, and that structure changed from one way with demerge to round trip. That language, the inclusion of round trip, was set up from warehouse to warehouse. So your view is that the sentence, or half sentence, or whatever it is in mod 1 that says, you shall not use these trucks for storage, was modified in mod 2? It was modified in both mod 2, or I should say that in mod 2 it reflects the party's understanding that the way any storage problems were going to be addressed was through the fee structure that was set up at mod 2, which at the time was unlimited. So exactly the way the parties performed here, the idea that there are no claims for storage problems while mod 2 was in effect, reflects that same understanding. That what the parties thought was that the payment structure that was going to handle things over 29 days, including where those delays were the result of storage, came from that payment structure. And as we discussed, Ms. Ford, there started to be problems, problems that each of the parties knew about. There was a summit that discussed these storage delays. There was an army captain, Captain Sinclair, who wrote and made reports. Those reports copied Mr. Switzer, and it talked about the existence of those delays. Mr. Switzer... But wasn't, I mean, the whole thing about mod 27 was that we're going to put a cap, but at the same time, we're going to do everything we can to make sure that these trucks get back to you in a quick fashion, right? Absolutely right, Your Honor. All right, so you don't really defend the board's position that it didn't have to decide the implied duty claim, do you? I think the board's position that it didn't have to decide the implied duty claim, I think, comes down to the ruling that the express language of the contract encompassed the implied duty. Right, but that's not, but under contract law, that's not really an actual principle. I see you saying that it was essentially harmless error, because there's no evidence of a breach. I think along the lines of, I mean, obviously, it would have been much more helpful to our position had the board elaborated on its reasons, but the reason standing alone that the plain language of the contract here, like as in Lakeshore and Metcalfe and the cases that talk about the implied duty, where the implied duty depends on what the actual terms of the contract are. And here, you cannot expand the duties under the contract in the way that the appellants attempt to here by where the contract itself encompasses those claims. Here, the delay. Well, the contract doesn't say, and the government can use the trucks for whatever purposes, and they don't have to use the trucks. I mean, in contemplating that we have an average time of returning trucks and we have an outside time of returning trucks, it would entail the contemplation that the trucks actually get returned, right? That's correct, Your Honor, but I would say there are also, you know, as a part of the negotiations for Mod 27, it wasn't simply the TLO program, the Transportation Liaison Officers, which was an attempt to reduce times, but there was also sort of two other negotiations back and forth. The first one is that there was a question of how much paperwork to put in, and Mr. Switzer was very clear that for any times over the minimum, which was the original draft, that would be too much of a problem, and Ms. Ford agreed to that, and the parties agreed on a sort of 19-day limit. That's telling here, because I believe it's 18 days, was the existing average trip time. So that reflects the parties' agreement that we are making this deal for everything, and for things over the average, up to 29, you show us documentation, we'll pay those claims, but you're also agreeing to a 29-day cap. The second point on that is that the parties also agreed to an increase in fees, that was something Mr. Switzer talked about originally, but they also agreed to a higher minimum for most of the regions of Iraq. So this is a deal that set a firm cap, a cap that Mr. Switzer, in his own words, said was unqualified, and at the time, objected to, but then eventually accepted as a part of the negotiations. But let me give you a hypothetical, and I know you would say that this, of course, didn't happen, but what if that deal was struck and it was all this understanding that you're going to get more money, and you're going to get more liaisons, and we're all going to make this whole deal, and you don't even bother giving back their trucks, because now we're protected, and they just went out of their way to sit on those trucks and made it impossible for them to live with this 29-day cap. You would agree in those circumstances that there's an implied duty claim that could be asserted, right? I think I would agree, Your Honor, with all of the regular caveats about hypotheticals. I think I would say that under those circumstances, there would at least be a claim, because if you take a look at Appendix 20, which is the Board's opinion, one of the things Ms. Ford testified to with respect to sort of exceptions and relief and all those things, she gives this specific example in her testimony where, for example, all of the trucks, and this is the quote part, were out over 29 days, and for some reason, Agility, was going to be out of business beyond their losses. That's the sort of circumstances that she had contemplated these kind of exceptions. So I think what I'd say to your question is, the scope of the agreement here was for a set of circumstances that looked like it did on the ground, and there's evidence in the record that there were delays of up to at least one truck had been reported out for over 150 days, and under those circumstances, where a small number, and Agility talked about my numbers, the numbers, and what they changed it to was days. The number 1,700 days was out of, I believe it's around 38,000, and that number is about 5%. So these numbers are still small, regardless of how you measure them. But the deal was that for this set of circumstances on the ground, we accept this cap structure, and I think, to your hypothetical, if the set of circumstances on the ground shifted in a dramatic fashion, then I think Ms. Ford would have admitted, and I think Agility would have, at least course of performance evidence, to say that's not the express bargain of a struck-up contract job. Did this trial, the proceeding that took place, I guess in a bifurcated way, so the second half never did take place, did Agility have the opportunity in the proceeding that actually did take place to prove up harms to itself, like we actually had to bring in 1,000 more trucks into the area because too many of our trucks were out for so long? Was that part of this proceeding? I'm at a bit of a disadvantage, Your Honor, in that I did not represent the government in that proceeding. It is my understanding, I know at a minimum, there was a selection, a poll of 50 trucks out of the 1,781 truck trips that had been over 29 days. Evidence was presented, and there is samples of that in the record, of 50 particular trucks. So there was at least a sampling of what the trucks looked like afterwards. And there is certainly evidence in the record of the existence of delays and emails that complained about various delays. Here, I guess, is what I'm trying to get at. It does seem to me that the correspondence surrounding the agreement on Mod 27 created a non-written-down contract between the government and Agility about submitting claims over and above the contract rate claims in Mod 27. And then there is a question, well, what was that agreement? And there was testimony, and Contracting Officer Ford testified, well, I contemplated it would be some sort of set of extreme circumstances. And I guess my question is, did Agility in this proceeding have notice of what it might have to prove to establish a breach of that non-written-down agreement so that it could prove that? Like, we had to bring in twice the number of trucks into the theater that we otherwise would have because we couldn't actually make the deliveries we were required to do because so many of our trucks were being used as giant refrigerators somewhere for a long time. I believe they did, Your Honor. And I know certainly they had the ability to cross Ms. Ford on this particular testimony to attempt to rebut it. And they certainly had the ability to look at any of the trips that were in question, including this 50 sample size, Your Honor. If we were to conclude that the board erred just as a matter of process in not addressing the implied duty claim, do we have to vacate and remand? Or is there any way that we could ever address that in the first instance? Well, I think that would be we could address it in the first place because this court could find as a matter of law that there's no implied duty because of the specifics of the contract, Your Honor. And they could find similarly there's no constructive change as a matter of law, de novo review, because any of the changes that are contemplated by the alleged constructive change flow from the direct changes to the contract. But we'd have to accept the proposition as a matter of law that an express contract can essentially wipe out the ability to assert an implied duty claim. Well, the ability to assert this particular implied duty claim, Your Honor, where it is entirely encompassed by the cap that the parties agreed to, and the multiple findings of fact from the board support the idea that this was the bargain that encompassed in the bargain the party struck was an unqualified 29-day cap that included storage delays. Okay. And even if we accept the board's conclusion that there wasn't a separate contractual agreement to look at additional claims, doesn't at least her view that you can make a claim indicate some conclusion that there might be an implied duty claim that could arise that wouldn't be completely covered by this? I think that it's certainly possible. I do not think these facts, these findings of fact, and this contractual arrangement support that idea. And that does go to another point. With respect to this unwritten duty claim, breach of promise claim I think they call it now, as we note, it's not in the complaint. And this evidence regarding the quote-unquote deal. It may not be in the complaint, but the board entertained it, right, and thought, yeah, there was an agreement, but it basically was an agreement that you'll get paid only under very extreme circumstances, and you haven't proved those extreme circumstances. Well, Your Honor, the board entertained it, but they entertained it within the scope of the actual breach of contract claim because agility had presented it as pre-dispute interpretation of the contract great way. So if you look at Appendix 40, where the board finds this, they talk about it in that sense, that it's a way to piggyback onto the contract claim, Your Honor, and it was not presented as a sort of independent breach claim. Right, so it was an agreement to exceptions. Let's call it that. But the nature of the exceptions were not written down, and that had to be established by testimony. That's correct, Your Honor. And in the sense of, at the board, that was used particularly to the topic of whether or not the contract said what it said. I see my time has expired, Your Honor. Thank you, Mr. Gwynne. Mr. Elwood has a little rebuttal time. Thank you, Your Honor. The government, its position is essentially that the contract was such that there was no need for the court to surmise or go into the question about the implied duty. But I think that that's kind of putting the cart before the horse in that this court has indicated in the Scott Timber case that the question of what were the reasonable expectations of the parties is an intensely factual question. And I think that the board should be given the opportunity in the first instance to determine what the understanding of the parties was with respect to what the obligation was of the government to return the trucks and what duties it had, and at what point the risks of the contract began. Because as Judge O'Malley got the government to concede, at some point there is a duty, the duty of good faith and fair dealing would click in, and the duty to facilitate the return of the trucks would be overborne, it would be violated in this case. But we don't know where that is. And that is a sort of, as the court has said, an intensely factual question that has to be undertaken by the board in the first instance. Now, the evidence in the record here, I think, undisputed evidence in the record, including some of the government's own witnesses, all of the government's own witnesses, indicates they very much believe that they weren't doing enough. That, again, Contracting Officer Ford's boss, Gary Shifton, said he thought Agility had a case for more compensation because they weren't doing enough to reduce the storage by buying enough refrigeration early enough in the conflict. And I think that is an indication that the people who know this case the best, the government people on the inside, when they don't know they're being watched, more or less, didn't think they were doing enough. And Gary Shifton said, in other circumstances, I really let this go too far. And that's the kind of evidence that the board had to consider in the first instance and see whether the implied duty was violated here. Another point which the government made was it tried to assert that the exception agreement, we call it, the informal agreement after Mod 27 was reached for concerning the post-Mod 27 era was waived. It's right there in our complaint in paragraph 29 and 51. And as Judge Toronto noticed, the board below certainly thought it was preserved enough that they addressed it. And I think the important thing there is that when you look at the actual government's own conduct, it's entirely consistent with what we say the agreement said, which was that above a certain time, we just have to document it well. And there's no evidence whatsoever that it was concerned cost, which was Contracting Officer Ford's explanation. Because after all, when she came back, when she got the documentation, she said they better prove in every instance that the delay was essentially the government's fault. She didn't say anything at all about cost until much, much later when she was finally denying the claim. At no point along in that situation did she say you have to prove evidence of cost. At a time when she was instead saying you have to prove it was the government's delay, she was not saying anything at all about cost. But if all they had to prove was that it was, if every time you could show that it was the government's fault, then what's the point of the 29-day cap? At a minimum, it is a much, it's a heavier burden. Instead of kind of ministerial information about name of the driver, truck vehicle identification number, time out, time in, and reason for the delay, we have to prove that the delay, that essentially the agility was blameless and the government had all of the blame. And secondly, the kind of quantum of documentation was much different in that for the pre-, the under-29-day claims, we gave them a spreadsheet of all the information. They asked, they audited essentially 3%. And for these, for the post-29-day claims, it was, to use Contracting Officer Ford's terms, mountains of paperwork. You had to lavishly document everything. So at a minimum, it was a much heavier showing on agility. If there are no further questions, we'll move on to submission. Thank you, Mr. Ellwood. We'll take the case under review.